UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

SHAKIMA LEWIS,

          Petitioner,

              v.                           CAUSE NO. 2:20-CV-325-JD-MGG

WARDEN,

          Respondent.

<u>OPINION AND ORDER</u>

Shakima Lewis, a prisoner without a lawyer, filed a habeas corpus petition under 28 U.S.C. § 2254 to challenge her conviction for child molestation, vicarious sexual gratification, and battery under Case No. 45G04-306-FA-17. Following a jury trial, on September 18, 2003, the Lake Superior Court sentenced Lewis to sixty-four years of incarceration.

In deciding this habeas petition, the court must presume the facts set forth by the state courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Court of Appeals of Indiana summarized the evidence presented at trial:

> Lewis is the biological mother of C.B., born on June 4, 1994, S.B. born on July 10, 1995, and S.L., born on July 16, 1996, and M.C ., born on November 5, 1998, (collectively referred to as the "Children"). Prior to August 2001, the Children lived with Lewis and Sedrick Lamont Curtis ("Curtis") in Lake County, Indiana. On August 31, 2001, as a result of allegations of physical abuse, the Children were removed from Lewis and Curtis's home and placed with a foster parent, Evelyn Murad ("Murad"). While the Children were in her care, Murad observed scars and open lacerations on C.B.'s back, arm, and side; "open spots" on S.B.'s back and

thigh; and open lacerations on S.L.'s thigh and arm. Murad also noticed that: (1) the Children were extremely thin, with the exception of M.C.; (2) the Children were very comfortable walking around each other nude; and (3) C.B. treated S.B. like his girlfriend rather than his sister. One day, C.B. and S.B. spontaneously shared their family "secrets" with Murad. In particular, C.B. said that sometimes he watched Lewis and Curtis having sex and that they would call him into the room and force him to perform oral sex on them. C.B. told Murad that Lewis and Curtis would beat him if he did not do what they had requested. C.B. further recalled that he and S.B. were made to perform sexual acts on each other while other people paid Curtis to watch.

S.B. told Murad that she and S.L. had to simulate a sexual act on each other "for the people," and that, on several occasions, she was forced to perform oral sex on Curtis or she would receive a beating. S.B. also told Murad that, sometimes, Curtis would pick her up while both of them were naked and would press her to his body and dance around the room until "white stuff came out of" his penis. Similarly, S.L. told Murad that she also was forced to perform oral sex on Curtis, and C.B., S.B., and S.L. all agreed that M.C. had to perform oral sex on Curtis and that, in so doing, M.C. bit Curtis. While the Children were in her care, Murad also witnessed C.B. jabbing a little plastic toy that resembled a penis between S.B.'s legs.

After hearing the Children's horrific secrets, and after noticing the Children's bizarre behavior, Murad contacted the Children's caseworker about the alleged abuse. Subsequently, because Murad, who was seventy-five years old at the time of the trial, could no longer care for the Children, the Children were moved to the home of Sharon Hicks ("Hicks").

On November 16, 2001, the Lake County Advocacy Center interviewed the Children separately. During his interview, C.B. testified that Lewis made "[S.B.] and [S.L.] suck between each other's legs" in front of ten other people and that Curtis made C.B., S.B., and S.L. "suck on him." C.B. also testified that Curtis "peed on [his] sisters." C.B. further testified that Curtis "stuck his thing" in C.B.'s "butt," and M.C. "suck[ed] on him and [M.C] bit him."

In her videotaped interview, S.B. corroborated C.B.'s testimony that Lewis and Curtis would make S.B. "suck between their legs." S.B. also testified that Curtis "put his pee-pee in her pee-pee" while people paid Lewis to watch. Likewise, during her interview, S.L. testified that M.C. sucked on Curtis's "ding-a-ling" and bit it. She also confirmed that all of the Children

were forced to perform oral sex and S.B. "sucked on [C.B.'s] ding-a-ling." In another videotaped interview, M.C. testified that he bit Curtis but he did not know where.

Doctor Edwin Udani ("Doctor Udani") examined the Children for signs of abuse and found that C.B. and S.B. had multiple scars on their backs, but S.L. and M.C. did not exhibit any physical signs of abuse. On January 7, 2002, Doctor Kalyani Gopal ("Doctor Gopal") interviewed the Children separately and they reported to her the allegations of physical and sexual abuse. Doctor Gopal began therapy with the Children, which focused upon controlling the Children's sexual urges—i.e., C.B. had acted sexually toward S.B.; S.B. and S.L. molested some children; and S.L said that she wanted to have sex with S.B. and other kids.

ECF 8-10 at 2-3; *Lewis v. State*, 907 N.E.2d 193 (Ind. App. 2009).

On September 8, 2004, the Indiana Court of Appeals affirmed Lewis's conviction and sentence. ECF 13-5. On April 16, 2007, Lewis initiated post-conviction proceedings, which culminated in the Indiana Supreme Court's denial of transfer on July 16, 2009. ECF 8-6; ECF 8-7. On March 23, 2015, Lewis requested authorization to file a successive petition, and the Indiana Court of Appeals granted this request. ECF 8-12. The Lake Superior Court denied relief on the successive petition, and the Indiana Supreme Court denied transfer on September 5, 2019. ECF 8-6; ECF 8-13.

On September 4, 2020, Lewis initiated this habeas case by filing a petition. ECF 1. In the petition, Lewis asserts that she is entitled to habeas relief due to trial court error and because she received ineffective assistance of trial counsel. She also asserts that the Lake Superior Court erred by declining to credit the victims' recantations during successive post-conviction proceedings. This claim is an attempt to assert a freestanding claim of actual innocence. While actual innocence may be a basis to excuse procedural deficiencies, federal courts have not recognized actual innocence as an independent

basis for habeas relief. *Herrera v. Collins*, 506 U.S. 390, 404–05 (1993); *Tabb v. Christianson*, 855 F.3d 757, 764 (7th Cir. 2017). Consequently, the court declines to further consider the assertion of actual innocence as a freestanding claim.

Lewis and Sedrick Curtis were tried jointly as co-defendants and proceeded jointly during successive post-conviction proceedings. By contrast, Lewis and Curtis had separate proceedings for sentencing, direct appeal, and initial post-conviction proceedings. They also separately initiated federal habeas proceedings, though their claims are substantially identical.

<u>TIMELINESS</u>

The Warden argues that the petition is untimely. The statute of limitations for habeas corpus cases is set forth in 28 U.S.C. § 2244(d), which provides:

The statute of limitations for habeas corpus cases is set forth in 28 U.S.C. § 2244(d), which provides:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> >
> > (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Based upon review of the record, the limitations period began to run in this case from the date on which the judgment became final pursuant to Section 2254(d)(1)(A).[1] On September 8, 2004, the Indiana Court of Appeals affirmed the conviction and sentence on direct appeal, and Lewis did not file a petition to transfer (ECF 8-2; ECF 8-5), so the conviction became final when the time for filing a petition to transfer expired on October 25, 2004. *See* Ind. R. App. 57(C) (petition for transfer must be filed within forty-five days). The limitations period expired one year later on October 25, 2005. Though Lewis initiated efforts to obtain post-conviction relief in 2007 and in 2015, these efforts did not restart the federal limitations period, nor did they "open a new window for federal collateral review." *De Jesus v. Acevedo*, 567 F.3d 941, 943 (7th Cir. 2009). Lewis did not file the habeas petition until September 4, 2020, (ECF 1), so the habeas petition is untimely

Lewis asserts that actual innocence excuses the untimely nature of her habeas claims and offers the testimony of three of the four victims, C.B., S.B., and S.L., as new evidence. A habeas petitioner can overcome untimeliness by establishing that the

---

[1] The recantations do not qualify under Section 2254(d)(1)(D) because they do not form the factual predicate of any cognizable claim asserted by Lewis.

court's refusal to consider an untimely claim would result in a fundamental miscarriage of justice. *McQuiggin v. Perkins*, 569 U.S. 383, 394 (2013). To meet this exception, the petitioner must establish that "a constitutional violation has resulted in the conviction of one who is actually innocent of the crime." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 536–37 (2006). In this context, the court may consider evidence only if it is reliable and was not presented at trial. *Gladney v. Pollard*, 799 F.3d 889, 898 (7th Cir. 2015). "The reviewing court then considers the total record—all the evidence, old and new, incriminatory and exculpatory—and makes a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* "It is not the role of the court to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id.*

At trial, the prosecution presented Evelyn Murad, who testified that she received custody of C.B., S.B., S.L., and M.C.[2] as a foster mother on August 31, 2001. Trial Tr. 46-73. The children told her that their parents had beaten them and had open lacerations and scars on their backs, sides, arms, and legs. *Id.* In October 2001, the children began

---

[2] At the time of their removal from Lewis's household, C.B., male, was seven years old; S.B., female, was six years old; S.L., female, was six years old; and M.C., male, was five years old. Direct Appeal App. 30.

making references to secrets after a visit with their parents, Curtis and Shakima Lewis.[3] *Id.* During that month, C.B. told Murad that he could see when his parents had sex, that they would call the children into the bedroom to perform oral sex, and that they would beat the children if they did not comply. *Id.* He also told Murad that he and S.B. performed sexual acts together for strangers who paid Curtis. *Id.* S.B. confirmed that these performances occurred and that she also performed sexual acts with S.L. *Id.* S.B. also told Murad that Curtis would press up against her without clothes on and dance until he ejaculated and that he had sex with her in the bathtub. *Id.* S.L. told Murad that she had to perform oral sex on Curtis. *Id.* C.B., S.B., and S.L. told Murad that M.C. had to perform oral sex on Curtis as well, and the children found it humorous that M.C. bit Curtis during one such incident. *Id.* Murad also observed C.B. and S.B. engage in sexual play with S.B. allowing C.B. to jab a penis-shaped toy between her legs. *Id.*

On October 26, 2001, Murad reported these allegations to Child Protective Services, which assigned Sandra Trass as an assessment worker. *Id.* at 134-37. On November 16, 2001, Trass videotaped interviews with C.B., S.B., S.L., and M.C. in which they repeated what they had told Murad, and the prosecution presented these interviews to the jury. *Id.* at 292-387. At trial, C.B., S.B., and S.L.[4] testified that they observed their parents using drugs, walking naked around the house, and engage in sexual intercourse. *Id.* at 156-218. They also testified that their parents beat them,

---

[3] According to the record, Lewis was the biological mother of all four children, while Curtis was the biological father of only S.L. and M.C. ECF 9-1 at 78, 103, 166, 180. For purposes of this order, the court will refer to Curtis and Lewis as the parents of all four children.

[4] As of trial, C.B. was nine years old, S.B. was eight years old, and S.L. was seven years old.

allowed them to watch pornography, and did not always feed them, but they declined to testify that they were involved in any sexual activity. *Id.* Other witnesses, including their adoptive mother and a treating psychologist testified to observing the children engage in sexual activity with other children and to hearing about such incidents from the children. *Id.* at 219-52, 387-423. At closing, trial counsel challenged the credibility of Murad and the victims and also characterized the interview techniques as suggestive and seeking a particular answer. *Id.* at 669-96.

In the successive petition proceedings, C.B., S.B., and S.L.[5] offered their testimony as newly discovered evidence. C.B. testified as follows:

> **PCR Counsel:** Do you remember living with your biological mother and Mr. Curtis back when you were children?
>
> **C.B.:** Not much to be honest.
>
> * * *
>
> **PCR Counsel:** What did we ask you to do [a few weeks ago]?
>
> **C.B.:** To watch the video interview.
>
> **PCR Counsel:** And did you watch the entire interview?
>
> **C.B.:** No, ma'am.
>
> **PCR Counsel:** And just to be clear, was it an interview of a woman interviewing you when you were a young child?
>
> **C.B.:** Yes, ma'am, it was.
>
> **PCR Counsel:** How old do you think you were when that happened?

---

[5] At the time of their testimony during successive post-conviction proceedings, C.B. and S.B. were twenty-one years old and S.L. was nineteen years old.

**C.B.:** Maybe five or six years old.

**PCR Counsel:** And you said you didn't watch the whole interview?

**C.B.:** I didn't.

**PCR Counsel:** Can you tell me why?

**C.B.:** I got frustrated.

**PCR Counsel:** Okay. Why did you get frustrated?

**C.B.:** I was getting frustrated -- I don't like to think about my past. I don't like to talk about it or bring it up. It just sticks with me in my mind, kinda brings up a lot of depression.

* * *

**PCR Counsel:** In the time after you were taken from your mother and Mr. Curtis, do you remember being asked a lot of questions about what they had done to you?

**C.B.:** Yes, I do.

**PCR Counsel:** What do you remember about that?

**C.B.:** I don't exactly remember what the question was, but maybe for the course of several weeks, we were repeatedly asked questions about people in offices, about things that may or may not have happened.

**PCR Counsel:** Were you interviewed by just a few people or many people?

**C.B.:** I'm not sure. It seemed like a lot to me.

**PCR Counsel:** Were you asked questions repeatedly?

**C.B.:** Yes, I was asked questions repeatedly. Sometimes I would get asked a question and then they would come back around to it if I didn't answer. Sometimes they would ask the same question several times but just word it differently. And sometimes they would just keep asking the same question over and over again. Kind of felt like I was obligated to answer the question, so just say something.

9

* * *

**PCR Counsel:** Did either your mother or Mr. Curtis ever perform sex acts on you?

**C.B.:** Not that I can remember. The only sexual things I remember were seeing them have sex twice. I don't remember anything else.

**PCR Counsel:** Did your parents ever make you perform sex acts with your siblings?

**C.B.:** No.

**PCR Counsel:** Do you understand that when you were a child you told people that your parents made you commit sex acts with each other?

**C.B.:** Yes, I do.

**PCR Counsel:** And with your sisters?

**C.B.:** Yes, I do.

**PCR Counsel:** How do you think that that happened?

**C.B.:** The only way I could have come up with things like that, I mean I had an imagination. As a kid, I had an imagination, then you side that with the fact that I'd see both of my parents have sex twice, and then you ask me a bunch of sexual related questions, I might not understand that we're talking about sex. But what I'm hearing brings up the image of what I saw. And then I try to make sense of the question that I'm being asked based off of what I've seen and I try to put myself in that situation. Basically, all I can do is live giving an example, honestly, like I'd seen my mother give my father hand jobs. If you're asking me if anybody in my family ever touched my bathroom parts -- as I guess that's what I called it as a child -- the image that's going to come to mind is a picture of my mom doing that to my dad. I still don't understand it. It still doesn't make sense why she wouldn't do that to me. So the best way that I can try to make sense of the question is by trying to imagine what it would be like if I was in that situation and answer the question based off a visual image that I made up to try to understand what was being asked, not off of something that actually happened.

**PCR Counsel:** Are you kind of an artistic person?

**C.B.:** Yeah. I draw a lot. I read a lot of graphic novels. When I don't understand something, even now, I try to visualize it to make sense of it. That's the only way I could have come up with anything. I think back on my past. I remember there being drugs, I remember being physically abused, I kinda remember being underfed, which is probably why I took a lot of food all the time and got in trouble for it. But I don't remember anything sexual happening, other than my parents having sex and that one time we were in the living room there watching that movie
.
**PCR Counsel:** Do you remember ever having to go to court back then?

**C.B.:** I remember going to court once. It was like a big room somewhere. We had traveled hours to go.

**PCR Counsel:** You had to travel to get there?

**C.B.:** Yeah, we had to travel. It seemed like it might have been hours. It was a big courtroom, a lot of people. Way bigger than this if I remember correctly. And I remember crying a lot. That's all I remember. I remember looking at my mom, seeing my mom's face and realizing that I said some stuff that wasn't true. And it hadn't occurred to me that I had said stuff that wasn't true until I looked at her, and then I'd just cried a lot.

\* \* \*

**PCR Counsel:** Are you telling the judge today that there was no sexual abuse?

**C.B.:** Yes, ma'am, I am.

ECF 9-1 at 32-48.

At the evidentiary hearing, S.B. testified as follows:

**PCR Counsel:** Do you remember having any conversations with Ms. Murad while you were there, about anything that your parents might have allegedly done to you?

**S.B.:** Yes.

**PCR Counsel:** What do you remember about that?

**S.B.:** We were sitting in a group. I believe my sister and I were getting our hair done, and we were all sitting in the living room. And I guess everybody just started talking.

**PCR Counsel:** And who was everybody? Who was there?

**S.B.:** My four siblings -- well, the four of us and Ms. Murad.

**PCR Counsel:** Did Ms. Murad have a husband or a boyfriend or a significant other?

**S.B.:** Not that I know of, no.

**PCR Counsel:** And do you know how long the conversation went on?

**S.B.:** No.

**PCR Counsel:** Do you know who started it?

**S.B.:** I don't quite remember, no.

**PCR Counsel:** Do you remember saying anything during the conversation, you personally?

**S.B.:** I don't remember saying anything.

* * *

**PCR Counsel:** Do you remember coming to court and testifying?

**S.B.:** Yes.

**PCR Counsel:** What do you remember about that?

**S.B.:** The room was bigger than this one, and it was a lot more people.

**PCR Counsel:** Do you remember what you testified to?

**S.B.:** Not really, just a lot of questions.

* * *

**PCR Counsel:** When you read [newspaper articles about her parents' criminal proceedings], what did you think when you read them?

**S.B.:** It was disgusting.

**PCR Counsel:** Did it jog your memories of this happening to you?

**S.B.:** In the courtroom, yes. But none of the stuff that was said ever came back to me like a recollection or anything. It just sounded really gross, to the point where I just stopped reading. And I just held onto them, so.

* * *

**PCR Counsel:** Do you recall meeting with myself and co-counsel here, Anne, and reviewing a video that was taken of you when you were a child?

**S.B.:** Yes.

**PCR Counsel:** When you watched that video, what reaction did you have? Do you remember sitting there being interviewed?

**S.B.:** No, I don't remember being interviewed. I think my first thought was how small I was. But once I got over that, and once we got over all the like weird questions, then it started to get to the point where she kept asking the same question over and over again, I kind of lost interest. Because, you know, after hearing the same thing over and over again, you kind of get tired of it. But I do remember watching the video. I don't remember the physical event of the video because it was so long ago. But the video itself -- I just didn't -- I lost interest.

**PCR Counsel:** Were those allegations that you made back, were they true?

**S.B.:** No.

**PCR Counsel:** And how do you know that?

**S.B.:** Something as traumatic as what we said happened, there's no way possible that anybody could ever forget something like that. No matter what you do, what you say, how you live your life, you will always remember if something that traumatic happened to you. There is nothing you can possibly do that can make you completely forget something that horrible. Like no type of hypnosis, therapy, nothing. Because there's one

small thing that will actually jog it back to you. You can't forget something like that, no matter how hard you try.

**PCR Counsel:** Has your memory every been jogged back to that?

**S.B.:** To being at home, to being with my parents, or to the abuse?

**PCR Counsel:** To these things -- yeah, to the abuse.

**S.B.:** No, I remember getting whippings, but who didn't. We were bad, so of course getting whippings I remember, I don't remember any type of sexual anything happening in that house. Like the most we ever did, we got whippings. But then again, kids our age with our amount of energy, always got whippings. But as opposed to the sexual allegations, no. We weren't even allowed to cross sides of the room with our siblings. Although we all shared the same room, we could not cross the guys' side, or the guys couldn't come on the girls' side. It was just strictly enforced. Like you know the rules.

**PCR Counsel:** So are you saying today that neither [of your parents] ever touched you in any sexual manner?

**S.B.:** No way whatsoever.

**PCR Counsel:** Did they ever, in any way, make you touch them in a sexual manner?

**S.B.:** No.

**PCR Counsel:** Did they ever make you touch either your sister or your brothers in a sexual manner?

**S.B.:** No.

**PCR Counsel:** Did they ever make you do anything sexual while people came over and watched?

**S.B.:** No.

**PCR Counsel:** Do you have any idea, you know, why as a child you might have said these things?

**S.B.:** Honestly, I don't.

14

*Id.* at 162-77.

At the evidentiary hearing, S.L. testified as follows:

**PCR Counsel:** Do you remember at that time being interviewed by a lot of people about things that your parents had done to you?

**S.L.:** Not really, to be honest. I know that we had to do therapy a lot, and stuff. But when I got back in the system, that's when everything resurfaced.

\* \* \*

**PCR Counsel:** Did we ask you to review a video [at the library in Merrillville]?

**S.L.:** That was the third time, I think. That was the third time when you showed me a video of me.

**PCR Counsel:** Was the video of a woman interviewing you when you were a small child?

**S.L.:** Yes.

**PCR Counsel:** What do you remember about the video?

**S.L.:** Nothing, really. Just she was asking me a whole bunch of questions. And I avoided most of them.

**PCR Counsel:** Did you tell the woman that you had gotten whoopings in your house with your parents?

**S.L.:** Yeah. All kids get whoopings though.

**PCR Counsel:** Did you say that there was any sexual contact between you and your parents during that interview?

**S.L.:** I don't know. I didn't like -- I watched it but I wasn't really paying attention to it.

**PCR Counsel:** Okay. Do you understand now that's what this case is about?

**S.L.:** Yeah.

**PCR Counsel:** And is it about the fact that when you were children with your siblings that you guys made statements that your parents had committed sex acts on you?

**S.L.:** I don't remember making statements.

**PCR Counsel:** I'm sorry?

**S.L.:** I don't remember making statements.

**PCR Counsel:** Okay. But do you understand now that that's what this case was about?

**S.L.:** Yes.

**PCR Counsel:** Did your parents ever make you commit any sex acts with them?

**S.L.:** I don't know. I was told that, yes.

**PCR Counsel:** Do you have any independent memory of that happening?

**S.L.:** I don't have a memory of anything.

**PCR Counsel:** You don't remember the whoopings?

**S.L.:** The only thing I remember -- the only memories I actually have are good ones, to be honest.

**PCR Counsel:** And can you tell me about those memories?

**S.L.:** My mommy was pregnant with my little brother and we were popping fireworks and she was singing to him. I remember we went to my aunt Tomeka's house -- I think it was a family reunion, or knowing us, just a party -- and playing in a car.

**PCR Counsel:** How do you think that it came to be that you guys made these allegations -- or that you made allegations against your parents?

**S.L.:** I don't know.

**PCR Counsel:** Do you remember telling me you felt brainwashed?

**S.L.:** Yeah, because everybody kept telling me stuff that I didn't remember. And I was angry, and I wanted answers, and I still haven't got them. This has been my entire life I've been searching for answers.

*Id.* at 102-09.

C.B., S.B., and S.L. also testified that they had been in contact with their parents and that C.B. and S.B. had recently lived with an aunt, who was Lewis's sister, and an uncle, who was Curtis's brother. *Id.* at 77-78, 114-16, 179-84. These older relatives coordinated the efforts to obtain the children's statements to secure Curtis's and Lewis's release from prison, and the children signed affidavits that were prepared by Curtis and Lewis and attached to the petition for authorization for a successive petition for post-conviction relief. *Id.* at 83-85, 189-91; ECF 9-2 at 110-11, 119-20, 139-48.

Michelle Cutler, a clinical psychologist, testified on behalf of the State. ECF 9-2 at 171-247. According to Dr. Cutler, attachment theory is the theory that humans have evolved to become emotionally attached to their parental figures as children to ensure their survival and that early relationships become the foundation for the child's ability to create and maintain relationships as they grow older. *Id.* at 208-12. A trauma bond occurs when the parental figure harms the child and the child takes measures to preserve the caretaking relationship with the parental figure. *Id.* at 212-14. These measures may consist of dissociation, which is an alteration of consciousness where the child is not integrating an abusive experience into their memory or their identity. *Id.* Children may also respond by blaming themselves. *Id.* In Dr. Cutler's experience,

17

children may respond to sexual abuse by indicating that they wanted it to occur or by otherwise seeking to protect the abuser from blame or punishment. *Id.* at 220.

According to Dr. Cutler, it is commonly accepted that recantations of sexual abuse allegations occur in twenty-five percent of cases. *Id.* at 227. Children are more likely to recant allegations of sexual abuse if the abuser is a family member with whom they have a close relationship. *Id.* at 228. Children may feel guilty or concerned about the consequences of the allegations experienced by their caretaker. *Id.* They may have been threatened or merely feel threatened due to the lingering effects of the abusive relationship. *Id.* at 228-29. They may also recant due to the unanticipated consequences to themselves, including separation from parents and siblings, moving to another home or school, and financial difficulties due to the loss of the abuser's income. *Id.* at 229. They may be motivated to recant in order to reunite their family. *Id.* These motivations to recant may persist into adulthood, and long-term separation may intensify the trauma bond by allowing the child to believe in an idealized version of the abuser. *Id.* at 230-32. Dr. Cutler also testified that children who have been sexually abused commonly engage in sexual behaviors with other children and that consistent narratives are key in assessing whether a child has been sexually abused. *Id.* at 199-201, 240-41.

The Lake Superior Court denied the successive petition for post-conviction relief, finding that the children's testimony either did not amount to a recantation or was not credible. ECF 8-17 at 20-21. On appeal, the Indiana Court of Appeals noted that the testimony of C.B., S.B., and S.L. reflected that they largely did not remember the events in question and that M.C. did not testify or submit a properly sworn affidavit. *Id.* at 24-

25. The appellate court concluded, "Any tendency of some of the children's statements to cast doubt on the reliability of the initial evidence would be slight in the light of their statements regarding their inability to remember." *Id.*

Here, the court pauses to consider the degree of deference it should afford to the State court's credibility findings when considering an assertion of actual innocence to excuse procedural default or untimeliness rather than a freestanding ground for habeas relief. The operative statute provides:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). In *Sharpe v. Bell*, 593 F.3d 372 (4th Cir. 2010), the Fourth Circuit Court of Appeals reasoned that no deference should be afforded to the legal conclusions of the State court pursuant to Section 2254(d) in the context of actual innocence claims because State courts do not typically consider such claims as defined by the Supreme Court of the United States in *Schlup v. Delo*, 513 U.S. 298 (1995). *Id.* at 378. However, the Fourth Circuit also reasoned that federal courts should afford deference to the factual determinations that may be relevant to federal claims of actual innocence under Section 2254(e)(1) based on the plain language of that provision as well as the overarching goals of the Antiterrorism and Effective Death Penalty Act of 1996, which include the furtherance of comity, finality, and federalism. *Id.* at 378-79.

While it does not appear that the Supreme Court or the Seventh Circuit Court of Appeals have expressly discussed this issue, other courts in this circuit have afforded

19

deference to factual determinations of State courts when considering claims of actual innocence consistent with *Sharpe. See Araujo v. Chandler*, 435 F.3d 678, 681–82 (7th Cir. 2005)*; Carter v. Nicholson*, 2019 WL 4034482, at *4 (N.D. Ill. 2019); *Carlos v. Williams*, 2015 WL 5009354, at *4 (C.D. Ill. 2015). Assuming that Section 2254(e)(1) applies, the court must credit the State court finding because Lewis has not submitted clear and convincing evidence that the State court erred by finding that the children's testimony did not amount to a recantation or was not credible based on their limited ability to remember the events in question. The evidentiary hearing transcripts provide ample support that C.B., S.B., and S.L. had experienced significant memory loss, and the other portions of their testimony, by themselves, fall short of clear and convincing evidence indicating that the children's testimony during successive post-conviction proceedings was credible. *See e.g., Kirkman v. Thompson*, 958 F.3d 663, 665 (7th Cir. 2020) (recantation, by itself, insufficient to rebut presumption of correctness of findings regarding credibility of that recantation); *Amerson v. Farrey*, 492 F.3d 848, 852 (7th Cir. 2007) (same); *Araujo,* 435 F.3d at 682 (same)*; Mendiola v. Schomig*, 224 F.3d 589, 592 (7th Cir. 2000) (same).

Further, even if this court considered the new evidence de novo, it would be unable to conclude that no reasonable juror could find that Lewis had committed the crimes of her conviction beyond a reasonable doubt. At this late stage of the proceedings, the record includes the children's interviews presented at trial, the children's testimony presented at successive post-conviction proceedings, and an expert witness's testimony suggesting that the children's recantations were not reliable. Unlike

her co-defendant Curtis, Lewis presented no expert testimony at the post-conviction

stage to suggest that the children's interviews were not reliable. In other words, the

evidence on record amounts to a swearing match on which a juror could reasonably

decide to convict or to acquit Lewis. As explained by the Seventh Circuit:

> [The petitioner] contend[s] that the default should be excused to avoid a
> "fundamental miscarriage of justice"-- which is to say, the conviction of an
> innocent person. Factual innocence indeed relieves a petitioner of a
> procedural default, at least when the error affects the finding of guilt, as
> opposed to a non-capital sentence. Yet how could we conclude, in the
> statutory language, that "the facts underlying the claim . . . establish by
> clear and convincing evidence that but for constitutional error, no
> reasonable factfinder would have found the applicant guilty of the
> underlying offense"? Suppose that the six alibi witnesses had been called.
> That would at best have produced a draw: six eyewitnesses identify [the
> petitioner] as the culprit, six others exculpate him. That cannot establish
> that "no reasonable factfinder would have found the applicant guilty of
> the underlying offense"; it is black letter law that testimony of a single
> eyewitness suffices for conviction even if 20 bishops testify that the
> eyewitness is a liar.

*Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005); s*ee also Moore-El v. Luebbers*, 446 F.3d

890, 903 (8th Cir. 2006) ("The existence of such a "swearing match" would not establish

that no reasonable juror could have credited the testimony of the prosecution witnesses

and found [the petitioner] guilty beyond a reasonable doubt."); *Bosley v. Cain*, 409 F.3d

657, 665 (5th Cir. 2005) ("At best, [the petitioner's] new evidence shows that a

reasonable doubt could have been found to exist; it fails, however, to satisfy his burden

of showing that no reasonable juror would have found him guilty. When we view all

the evidence-both the new evidence and the evidence offered at trial-we are left with a

classic swearing match."). Therefore, the court concludes that Lewis has not adequately

demonstrated a claim of actual innocence. Consequently, the court denies the habeas petition because it is untimely.

* * *

In *Arnold v. Dittman*, 901 F.3d 830 (7th Cir. 2018), the Seventh Circuit Court of Appeals considered a habeas case similar to this case in some respects. There, the petitioner had been convicted of sexual assault of a child based primarily on the testimony of the victim, who was also his son. *Id.* at 832. Three years later, the victim signed an affidavit in which he recanted his prior testimony and attested that he had falsely accused his father to complete a program under the supervision of the juvenile court, and the petitioner submitted the affidavit in tandem with a petition for post-conviction relief. *Id.* at 834. The State courts denied the petition without a hearing after finding that the affidavit did not constitute new evidence under State law because other witnesses at trial had testified about the victim's prior recantations, rendering the affidavit cumulative evidence. *Id.* at 834-35.

On federal habeas review, the petitioner's sole claim was a freestanding claim of actual innocence based on the victim's recantation. *Id.* at 835. The district court found that the petition was untimely but considered whether the actual innocence exception excused the untimeliness. *Id.* at 835-36. The district court relied on the State court analysis to determine that the petitioner had not satisfied his burden to show that "it [was] more likely than not that no reasonable juror would have convicted him in light of the new evidence" and to conclude that the actual innocence exception did not apply. *Id.*

On appeal before the Seventh Circuit, the petitioner's central argument was that the veracity of the victim's recantation had not been reviewed by any court and that an evidentiary hearing would be required to do so. *Id.* at 838. The Seventh Circuit rejected the State's argument that the petitioner could not, under any circumstances, satisfy the burden of proof required for a freestanding claim of actual innocence given that the burden of proof for such claims remains an open issue.[6] *Id.* The appellate court acknowledged that the evidentiary burden for the petitioner was high and that there were substantial reasons to question the credibility of recantations as a general matter. *Id.* at 838-40. However, it declined to find that the petitioner could not satisfy the burden of proof without the benefit of an evidentiary hearing in a case where the conviction so heavily relied on the victim's testimony that he now sought to recant. *Id.*

The Seventh Circuit further found that the district court should not have relied on the State court's characterization of the affidavit as cumulative evidence given that it was made in the context of whether the affidavit amounted to new evidence under State law rather than in the context of a credibility determination. *Id.* at 840-41. The Seventh Circuit also found that the recantation constituted new evidence under the federal

---

[6] In *Herrera v. Collins*, 506 U.S. 390 (1993), the Supreme Court assumed that "in a capital case a truly persuasive demonstration of actual innocence made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id.* at 417. The Supreme Court further noted that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.* Nevertheless, to date, the Supreme Court has not yet resolved the issue of whether a freestanding claim of actual innocence is a valid basis for habeas relief or the precise burden of proof such a claim would require. *See McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence.").

actual innocence exception given the material difference in the persuasive force between a third party's testimony of a victim's prior inconsistent statements that the victim denied uttering and a victim's unequivocal recantation. *Id.* at 841-42. The Seventh Circuit concluded by remanding the case to the district court for an evidentiary hearing. *Id.* at 842.

Though *Arnold* bears some similarity to this case, it remains distinguishable and does not affect the disposition of this case. Most significantly, here, the State courts afforded Lewis an evidentiary hearing on the victims' recantations. Unlike the petitioner in *Arnold*, Lewis has never requested an evidentiary hearing before this court but instead asks this court to evaluate whether the State courts' credibility determinations were unreasonable. Further, this court did not rely on the State courts' analysis of whether the recantations constituted new evidence under State law but instead deferred to the State courts' credibility determination as required by 28 U.S.C. § 2254(e)(1) in addition to conducting an independent credibility analysis. Finally, though the court assumes for the sake of this order that the recantation evidence qualifies as new evidence for purposes of the actual innocence exception, this issue is substantially closer than in *Arnold* given that, even at trial, the victims declined to implicate Lewis with respect to the crimes of her conviction, and the victims' testimony at the post-conviction stage was almost entirely consistent with their testimony at trial.

<u>CERTIFICATE OF APPEALABILITY</u>

Pursuant to Section 2254 Habeas Corpus Rule 11, the court must consider whether to grant or deny a certificate of appealability. To obtain a certificate of

appealability when the court dismisses a petition on procedural grounds, the petitioner must show that reasonable jurists would find it debatable (1) whether the court was correct in its procedural ruling and (2) whether the petition states a valid claim for denial of a constitutional right. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, there is no basis for finding that jurists of reason would debate the correctness of this procedural ruling, so there is no basis for encouraging Lewis to proceed further in federal court.

For these reasons, the court:

(1) DISMISSES the petition (ECF 1) because the claims are untimely;

(2) DENIES Shakima Lewis, a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and

(3) DIRECTS the clerk to close this case.

SO ORDERED on January 18, 2022

/s/JON E. DEGUILIO
CHIEF JUDGE
UNITED STATES DISTRICT COURT